**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| Janyce LEWIS, Deborah COOPER, Clarissa FOLLEY, Harold FOLLEY, Earletta GLADDEN and Telambria TINSLEY, Individually and on behalf of all persons similarly situated  and Charlottesville Public Housing Area Residents (PHAR)  **Plaintiffs** | )  )  )  )  )  ) **Judge:** |
| **V.** | ) **Case No.:** _____ |
| CHARLOTTESVILLE REDEVELOPMENT & HOUSING AUTHORITY, | )  )  COMPLAINT |
| CONSTANCE DUNN, in her official capacity As the Executive Director of the Charlottesville Redevelopment and Housing Authority | ) CLASS ACTION  )  )  ) |
| **Defendants** | )  )  ) |
| **Serve: CONSTANCE DUNN, Executive Director** Charlottesville Redevelopment and Housing Authority 605 East Main Street Charlottesville, Virginia 22902 | )  )  )  ) |

_____

**COMPLAINT**

**PRELIMINARY STATEMENT**

1.       Tenants of public housing in Charlottesville, Virginia challenge the failure of the

Charlottesville Redevelopment and Housing Authority (CRHA) to provide adequate and

documented utility allowances as required by federal law.  The U.S. Department of Housing and

Urban Development (HUD) provides federal funds to operate the CRHA, which is charged with

providing low income tenants decent, safe, and affordable housing.

1

2.      The United States Housing Act, 42 U.S.C § 1437a(a)(1)(A), and its implementing regulation, 24 C.F.R. § 965.505(a), mandate that public housing tenants residing in the CRHA units should not be charged more than 30% of their income for rent and utilities. To comply with the Act, public housing agencies like CRHA must set an adequate allowance to cover reasonable consumption of utilities when setting the rent.

3.      The CRHA violates this Act by systematically setting utility allowances for electricity so low that most tenants are assessed excess electric utility charges each month.

4.      As a monthly average, 73% of public housing residents in Charlottesville were billed for excess charges over the last two calendar years, 2010 and 2011. The percent billed for excess charges ran from 50% in March 2010 to 92% in August 2011. *See* Attachment 1, Summary of Electric Surcharge Data.

5.      In 2003 the CRHA adopted the current allowance for their 271 units subject to electric utility billing on a monthly basis varying by number of bedrooms. *See* Attachment 2, Resolution No 2058, Revised Public Housing Utility Allowance, July 28, 2003.

6.      In the same Resolution, the CRHA also promised an incentive of a $50 US Savings Bond to residents who keep their utility usage within the allowance but has failed to follow through or recognize this incentive. *See* Attachment 2. In the nine years since the Resolution, no one has received a savings bond.

7.      The aggregate billing to CRHA residents for alleged excess electric usage exceeded $50,000 in each of the past two years.

8.      Upon information and belief, the aggregate billing to CRHA residents for alleged excess electric usage has totaled approximately $400,000 since the imposition of the current allowance in August 2003.

9.      The six individual Plaintiffs bring this class action on behalf of all present and former tenants who since August 2003 have had excess utility surcharges assessed against them which have caused the tenants to pay more than 30% of their income for rent.  Suit is also brought by the sub-class of tenants who, due to not exceeding the electric utility allowance over a twelve month period, should have received a $50 savings bond.

10.     The Plaintiffs ask the court to enjoin the CRHA from failing to update its utility allowances to comply with federal law.

11.     The Plaintiffs also ask the court to require the CRHA to provide a refund of illegally charged electric utility fees and appropriately award the promised incentive to certain low-use residents.


## JURISDICTION

12.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and 1337. This case arises under the United State Housing Act of 1937, 42 U.S.C. § 1437a *et seq.*, as amended, and 42 U.S.C. § 1983.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the Virginia state law claims in this Complaint.


## PARTIES

13.     Plaintiff Janyce Lewis  is an adult and a public housing resident who lives on Hardy Drive, Charlottesville, VA in the Westhaven site.

14.     Plaintiff  Deborah Cooper is an adult and a public housing resident who lives on South First Street, Charlottesville, VA in the South First Street  site.

15.     Plaintiffs Clarissa Smith Folley and Harold Folley, Jr. are married adults who were public housing residents from 1997 until April 2011 where they lived at 812-E Hardy Drive in the Westhaven site, and who are now homeowners in Charlottesville, VA.

16.     Plaintiff Earletta Gladden is an adult who lives in public housing located on Hardy Drive, Charlottesville, VA in the Westhaven site.

17.     Plaintiff TelambriaTinsley is an adult and a public housing resident who lives on Hardy Drive, Charlottesville, VA in the Westhaven site.

18.     Plaintiff CharlottesvillePublic Housing Association of Residents (PHAR) is an association made up of residents of public housing and other low-income people in Charlottesville, Virginia.  PHAR's mission is to empower low-income residents to protect and improve the CRHA-owned housing through community collective action.

19.     Defendant Charlottesville Redevelopment and Housing Authority (CRHA) is a duly organized and recognized agency of the State of Virginia under the Code of Virginia, §36-4 with the power to sue and be sued. The CRHA owns and operates approximately 376 units as public housing in the City of Charlottesville  and receives  funding provided by the United States Department of Housing and Urban Development under the United States Housing Act of 1937.

20.     Defendant Constance Dunn is the Executive Director of the CRHA. She has the duty and full authority over the CRHA to see that the CRHA's policies and practices conform to the law. She is also responsible for the operation and administration of the CRHA. She is sued in her official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

21.     Public housing such as the CRHA's sites are operated with substantial federal financial support provided through the United States Department of Housing and Urban Development (HUD) under the United States Housing Act of 1937, 42 U.S.C. § 1437.

22.     The receipt of such federal funds requires Defendants to operate the housing complexes in accordance with the requirements of the United States Housing Act of 1937 and applicable HUD regulations. 42 U.S.C. § 1437i.

23.     These federal laws prescribe the powers and authority of the Defendants and require Defendants to undertake certain responsibilities or perform certain actions to protect and benefit public housing residents including the Plaintiffs and the class.

24.     Under the Brooke Amendment to the National Housing Act, the maximum rent which Defendants may charge residents may not exceed 30% of the family's adjusted gross income.  42 U.S.C § 1437a(a)(1)(A). This maximum-rent figure must include an allowance for the "monthly cost of a reasonable consumption of [tenant-paid] utilities . . . by an energy-conservative household of modest means, consistent with the requirements of a safe, sanitary and healthful living environment."  24  C.F.R. § 965.505(a).

25.     Housing Authorities are required to maintain records that "document the basis on which allowances and scheduled surcharges, and revisions thereof, are established and revised. Such record shall be available for inspection by residents." 24 C.F.R. § 965.502(b).

26.     When a Housing Authority properly calculates the utility allowances, the shelter costs of rent plus utilities should not exceed 30% of their income for tenants who consume a reasonable amount of utilities or less.

27.     Housing Authorities shall regularly review the basis on which utility allowances have been established and make revisions to the rate if necessary to assure reasonableness. 24 C.F.R. § 965.507.

28.     When creating utility allowances, a Housing Authority shall take into consideration at least nine HUD-enumerated factors. 24 C.F.R. § 965.505(d).  These factors include the equipment and functions intended to be covered by the allowance; the climate of the location of the project; the size of the unit and the number of occupants per unit; the type of construction and design; the energy efficiency of the Housing Authority supplied appliances; the utility consumption requirements of the appliances supplied by the tenant; the physical condition of the project; temperature levels intended to be maintained in the unit; and the temperature of hot water for domestic use. Id.

29.     A Housing Authority must also adopt criteria and procedures for granting adjustments to the utility allowance for residents who are elderly, ill, or disabled and whose special needs require them to consume utilities in excess of the allowances, or tenants with special factors affecting utility usage not within the control of the resident. 42 U.S.C. § 1437a(a)(3)(B)(i) and  24 C.F.R. § 965.508.

30.     The criteria for granting the relief in 24 C.F.R. § 965.508 must be adopted at the time the Housing Authority adopts its methods and procedures for determining utility allowances. This information must be provided to tenants upon admission and when the authority establishes or adjusts allowances.

31.     The standard lease agreement that the CRHA requires its residents to sign states that management shall furnish utilities. See, Attachment 3 ("Dwelling Lease"), Section 7.

6

32.     The lease further states that residents may be assessed excess utility surcharges when their usage exceeds their allowance.  Id. Section 7.A.

33.     The CRHA has entered into Annual Contributions Contracts (ACC) with HUD that have been in full force and effect at all relevant times. Under the ACC, HUD makes annual contributions to the CRHA to subsidize the cost of operating and managing low-income public housing in Charlottesville, Virginia. 42 U.S.C. §§ 1437c, 1437d, 1437g and 1437i.

34.     In consideration for receiving financial assistance from HUD, the CRHA agreed in the ACC to comply with HUD requirements for the development and operations of public housing, including the setting of adequate utility allowances. 24 C.F.R. § 5.403.

35.     The public housing tenants in Charlottesville are the intended beneficiaries of the ACC between HUD and the CRHA.

36.     Although the above statutes, regulations, and standard lease provide that tenants shall pay a maximum of 30% of their income for housing, Defendants' inadequate electric utility allowance results in tenants paying more for rent than Congress intended.  42 U.S.C. §§ 1437a(a)(3)(B)(1).

37.     The CRHA's Resolution No 2058, Revised Public Housing Utility Allowance, July 28, 2003 set new allowances and pledged to pay a $50 saving bonds as an incentive to conserve electricity for all residents who did not exceed the allowance over a twelve month period.  This promise is actionable under Virginia Code § 8.01-27.  *See*, Attachment 2.

## STATEMENT OF FACTS

38.     The CRHA owns and manages various public housing sites in the City of Charlottesville comprising some 376 units.

39.     The units affected by this action include Westhaven (126 units), South First Street (58 units), Riverside Avenue (16 units), Sixth Street (25 units), Madison Avenue (18 units), Michie Drive (23 units) and four detached residential structures, one of which is a duplex (5 units).

40.     Crescent Hall, a single building with 105 units for the elderly and disabled, is excluded because all standard utilities are part of the rent and not individually metered. A total of approximately 271 CRHA-owned units are at issue in this case.

41.     Westhaven was built in the mid-1960s as a result of the then-popular urban renewal, after the CRHA devised a plan for total clearance of Vinegar Hill, a thriving area of black-owned businesses and homes. Some renters and home-owners from Vinegar Hill were relocated to Westhaven.    The rest of the CRHA housing was all built in excess of thirty years ago.  As a product of the architecture and low-energy prices of the time, none of the subject properties were designed or constructed with an eye to modern energy conservation principles or standards.

42.     All of the relevant 271 properties are "check metered" projects, which means that each building has a master meter to measure the overall utility usage to the building, as well as individual check meters for each unit, which measure the amounts of utilities used by that unit. CRHA personnel read the check meters, usually on a monthly basis.  The measurement for electricity is in kilowatt hours.

43.     The individual check meters are of many different ages, brands and reliability. Tenants have concerns about accuracy and the lack of response by the CRHA in response to complaints.

8

44.     The check meters permit the CRHA to monitor utility usage on a household basis. The CRHA pays the utility bills of the entire development based on the master meters, which meter the total usage of a building.  Each building has a number of separate apartments. The check meter measures the usage for the individual apartments.  There is no known reconciliation or proofing between the check meters and the master meters.

45.     Each tenant is allocated a utility allowance in energy units which should be based on reasonable consumption for the size of the family and the thermal characteristics of the unit. The standard allowance is based on an alleged 2003 study contracted for by the CRHA.  The study has not been produced, reviewed or updated.

46.     If the usage in any one month exceeds the allowance, the CRHA bills the tenant for the excess kilowatt hours times the approved rate, which has been $.0694/kwH and unchanged since 2003.

47.     In the check metered units, the cost of reasonable utilities should be covered by the tenant's utility allowance, so that the sum of rent and utilities  should not exceed 30% of the tenant's adjusted gross income.

48.     The CRHA has not updated its utility allowances since 2003.

49.     The 2003 study is reportedly  missing and cannot be found by the CRHA .  The CRHA's ability to produce the  study was denied in response to a FOIA request.

50.     Without the study, it is impossible to review the methodology or the assumptions used to create the current utility allowances.

51.     CRHA has no basis to show that the allowances used since August 2003 approximate "a reasonable consumption of utilities," as required by HUD regulations.  24 C.F.R. §§ 965.505(a) and 965.507(b).

52.     Although rents for public housing tenants are limited to 30% of their income, the failure of the CRHA to provide a reasonable electric utility allowance as part of the rent means that the Plaintiffs have paid amounts for rent plus reasonable quantities of utilities that exceed the statutory maximum tenant contribution.

53.     The CRHA has known at least since the summer of 2010 that the study allegedly conducted in 2003 is missing.  Even in light of that information and without performing a new study, the CRHA has not stopped assessing fees based on the old analysis, which means that tenants have been and are still being billed and paying for such fees.

54.     HUD's public housing guidance states that consumption that routinely exceeds the allowance constitutes evidence of the insufficiency of the allowance. These guidelines promulgated by HUD encourage allowances based on actual consumption data. HUD Public Housing Occupancy Guidebook, June 2003.

55.     The CRHA requires incoming tenants to sign a lease that warrants that the CRHA will provide utilities and that any utility usage beyond the tenant's allowance becomes the tenant's responsibility. See, Attachment 3, Section 7.A .  The lease is a contract which binds both the CRHA and the tenant.

56.     Since July 2003 the CRHA has never promulgated criteria or procedures for adjusting utility allowances for tenants when the utility amounts are beyond the tenant's control.

57.     At no time since 2003 have Defendants conducted an analysis, study or professional review to determine if the excess utility surcharges assessed against a resident were beyond the tenant's control.

58.     Although Section 7.D of the Lease states that excess utility fees "shall be due and payable on the first day of the month after the Authority has given the Resident 14 days written

10

notice of the charge," from 2003 until February 2011, the CRHA billed residents in the same month that notice of charges was given.  This allowed no time for the resident to query the accuracy of the meter reading or the billing.

59.    If the tenant did not pay in full by the tenth day of the month, a late or administrative fee of $10.00 was imposed for each occurrence for each resident.  Continued failure to pay the accelerated utility charges could lead to the issuance of a Summons for Unlawful Detainer, involving a charge to the resident and possible eviction.

60.    Each year the CRHA has entered into an ACC with HUD. The CRHA represents in this contract that the CRHA is complying with HUD's guidelines in order to be eligible for HUD funds to operate the CRHA's public housing units.

61.    The ACC specifically requires that the CRHA operate its program in compliance with the U.S. Housing Act. This contract is drafted to ensure that the residents are receiving their appropriate benefits under the U.S. Housing Act, thus, making the residents a third party beneficiary. By failing to provide adequate utility allowances, the Defendants are in breach of the ACC.

## INDIVIDUAL PLAINTIFF'S FACTS

**62.    Ms. Janyce Lewis**

63.    Plaintiff Janyce Lewis has been a resident on  Hardy Drive in Westhaven since February 2005.

64.    She lives in a two-bedroom apartment with her son, Travis, a student who expects to graduate from Charlottesville High School in June 2012.  She is currently working as an organizer for City of Promise.

65.     She has been billed for excessive usage for many months for the past several years.

66.     Her commitment to paying her rent led her to take out a payday loan at 161% interest per year.

67.     Her inability to pay the loan has caused her substantial stress and required her to forego some basic necessities, such as groceries for her and her son, household items, toiletries, and necessary car maintenance.

68.     Ms. Lewis personally initiated, wrote and circulated a petition in the fall of 2010, which protested the excess utility fees.  The petition was signed by approximately forty residents and presented to the CRHA board at their November 2010 meeting.

69.     In 2010 Ms. Lewis was billed for and paid $250 in excess electric utility charges.

70.     In 2011 she was billed for and paid $256.

71.     This is a total of $506 over the past two years.

72.     In some months when the CRHA was accelerating the excess utility charges, Ms. Lewis was unable to pay the presented billings by the 10th of the month and a late fee was imposed.

73.     She later paid the late fee to avoid additional late fees and possible eviction.


**74.     Ms. Deborah Cooper**

75.     Plaintiff Deborah Cooper currently resides at the South First Street site which is at the intersection of South First Street and Elliott Avenue.

76.     Ms. Cooper has been a tenant of CRHA for approximately 27 years.

77.     She has raised a number of foster children during this time but as they have grown or moved out, she now resides only with her 17-year-old granddaughter.

78.     As a result, in the past year Ms. Cooper downsized from a 4-bedroom unit to a 2-bedroom unit.

79.     Ms. Cooper currently pays $432 in rent each month, though in the past, when her household income was higher and she had a larger unit, she paid as much as $1000 per month in rent.

80.     Ms. Cooper has been charged for excess electric utilities each year since 2003.

81.     In 2010 Ms. Cooper was billed for and paid $556 in excess electric utility charges.

82.     In 2011 she was billed for and paid $518, totaling $1,074 over the past two years.

83.     Ms. Cooper sometimes uses a prescribed C-pap machine during the night to help her breathe due to her sleep apnea.

84.     CRHA has never adjusted Ms. Cooper's utility charges to reflect her usage of this machine.

85.     Although the charges mean that she has had to stretch her limited budget to pay for rent and utility charges, Ms. Cooper has paid the excess utility charges each month because she felt that they were an unavoidable part of her financial obligation to CRHA, and she did not want to get into trouble with CRHA.

86.     **Ms.Clarissa (Smith) Folley and Mr. Harold Folley, Jr**.

87.     Plaintiffs Clarissa (Smith) Folley and Harold Folley, Jr. lived in a three-bedroom apartment at 812-E Hardy Drive in Westhaven, from 1997 until they moved out in April 2011.

88.     They now own their own home in Charlottesville.  Their new home was acquired through the "sweat equity" program of Habitat for Humanity on the site of the former Sunrise Trailer Park.

89.     The Folleys have five children between the ages of eight and twenty-one.

90.     Harold himself was born in Westhaven in 1971 and lived there with his parents until he was an adult.

91.     He works at Virginia Organizing and is very proud of his status as a homeowner.

92.     As their income rose over the years, the Folleys' base rent rose in proportion as the rent was calculated as 30% of income.  Their rent increased from approximately $150/month to $850/month.

93.     The Folleys were billed for varying amounts of alleged excess electricity utility consumption during their years at Westhaven.

94.     In 2010 the Folleys were billed for and paid $182 in excess electric utility charges.

95.     In 2011 they were billed for and paid $63 for the three months they lived in Westhaven before moving out.

96.     The Folleys understood that their obligation to pay the CRHA came first because the consequence of not paying might mean losing their apartment home.

97.     The Folleys knew that the cost of receiving a Summons for Unlawful Detainer was high as a percentage of their rent, so they did everything possible to avoid court fees.

98.     This required them to avoid or delay purchasing family and personal necessities such as groceries and medicine in order to pay the excess electric utility charges that pushed the rent beyond 30% of the family income.

14

99.     Mr. Folley is a diabetic and a migraine-sufferer over the course of his time in CRHA housing.  The increased stress from financial pressures negatively affected his health. Mr. Folley's increased sugar levels often caused blurred vision.

100.     In some months during their tenancy, when the CRHA accelerated the excess utility charges, the Folleys were unable to pay the presented billings by the tenth of the month and a late fee was imposed, which was an additional burden but had to be paid.

**101.     Ms. Earletta Gladden**

102.     Plaintiff Earletta Gladden has lived on Hardy Drive in Westhaven since October 2005.

103.     She lives in a three-bedroom apartment with her daughter, age 13, and her grandson, age 15.

104.     She has lived in her present apartment since August 2009.

105.     Ms. Gladden has been assessed excess utility charges for electricity almost every month since she moved into Westhaven.

106.     The excess charges have ranged from approximately $74 per month to a high of $147 per month.

107.     Her rent without the excess electricity charges is $298 per month.

108.     In 2010, Ms. Gladden was billed for and paid $576 in excess electric utility charges.

109.     In 2011, she was billed for and paid $858.

110.     This is a total of $1,434 over the past two years alone.

111.    Because she does not want to receive an eviction notice and to be assessed court fees, Ms. Gladden pays the excess electricity surcharges in addition to her monthly rent.

112.    Ms. Gladden had to stop working at the end of 2005 under doctor's orders. She suffers from multiple sclerosis, fibromyalgia and from asthma and allergies.

113.    When the weather changes or when it is warm outside, she is likely to experience severe breathing problems.  To relieve these symptoms, she uses a nebulizer and a vaporizer.

114.    The poor air circulation in the apartment also aggravates her asthma, and she frequently runs her air conditioner year around.

115.    These medical problems necessitate her periodic use of more electricity.

116.    Ms. Gladden's grandson suffered brain damage due to meningitis at age six months, and he is disabled.  He also suffers from asthma.

117.    When the weather changes or when it is warm outside, he is likely to experience severe breathing problems.  To relieve these symptoms, he, too, requires a nebulizer and a vaporizer.

118.    When he experiences more than the usual problems with breathing in the winter, a fan is run in his room.

119.    Thus, his medical problems necessitate periodic use of more electricity.

120.    Ms. Gladden has repeatedly asked the CRHA about why she is receiving excess utility charges.

121.    Reportedly, the staff  almost always responded by saying that they "will look into it".    No one has provided Ms. Gladden any explanation.

122.     Many months Ms. Gladden must borrow money from her adult children to meet the costs of household necessities.  She would be able to manage her bills from month to month if she did not have to pay an electricity surcharge.

### 123.     Ms. Telambria Tinsley

124.     Plaintiff Telambria Tinsley lives on Hardy Drive in the Westhaven site.  She has been a resident since January 2011.  She lives with her one child.

125.     Being on a very tight budget Ms. Tinsley is very conscious of the possible burden of excess electric fees, so she has developed and stuck to conservative usage habits to avoid them.

126.     Her household consumption of electricity has been less than the utility allowance since she has been under lease with the CRHA.

127.     Ms. Tinsley has not received the $50 saving bond offered to residents whose usage is under the allotment for a twelve month period.

### 128.     The Charlottesville Public Housing Association of Residents (PHAR)

129.     The Charlottesville Public Housing Association of Residents (PHAR) is a non-profit organization founded in 1998 and incorporated under the laws of the Commonwealth of Virginia.

130.     PHAR has an elected Board of Directors.

131.     The CRHA acknowledges PHAR as a representative of the public housing residents pursuant to applicable federal housing regulations, 24 C.F.R. § 964.

132.     In its regular outreach to residents about the problems they experience and which they want PHAR to address, members have described the hardships they are facing because of excess utility surcharges.

133.     PHAR supported the circulation of a petition in 2010 requesting that the CRHA address the issue of the high rates of excess utilities surcharges.

134.     PHAR representatives have testified before the CRHA Board about the problems its members face in paying the excess utilities surcharges.  No response from CRHA was received by PHAR.

135.     PHAR's outreach and organizing work has improved public housing neighborhoods, including obtaining playground renovations; improvements to maintenance, customer service and safety; and incorporated residents into redevelopment planning.  As the citywide public housing resident association, PHAR works on a variety of neighborhood improvement issues, as well as pioneering a successful Internship Program.

## CLASS ACTION ALLEGATIONS

136.     The individual Plaintiffs bring this action pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure.

137.     The named individual Plaintiffs seek to represent a class and a subclass of present and former public housing tenants of the CRHA.

138.     Named Plaintiffs Janyce Lewis, Earletta Gladden, Deborah Cooper, Clarissa Smith Folley, Harold Folley and Telambria Tinsley represent a class of current and former public housing tenants who have been subject to utility allowances calculated on an unknown,

undisclosed and unjustified basis from August 2003 through the present. The rates and allowances are based on a simple resolution, which was founded on an alleged but now missing study.   The allowances have frequently caused an assessment of illegal excess utility surcharges and led to tenants paying more than 30% of their incomes as rent.

139.    Named Plaintiff Telambria Tinsley represents a subclass of tenants who did not incur excess utility charges during some 12 month period from August 2003 through the present, and to whom CRHA did not give $50 savings bonds as CRHA had promised in its Resolution No. 2058.

140.    Plaintiffs' claims meet the requirements of Rule 23(a), Fed. R. Civil Pro. The number of individuals in the class exceeds 300 individuals. The class is comprised of persons who were all residents of  public housing.  Some continue to live in the CRHA housing and some now reside elsewhere.  The CRHA has acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.  The relatively small size of the individual claims, the geographical dispersion of the class, and the financial circumstances of the class members make the maintenance of separate actions by each class member economically infeasible.  The class is so numerous that joinder of all members is impracticable.

141.    Questions of law and fact common to the class include:

a.    Whether the CRHA's utility allowances since August 2003 have been sufficient to ensure that tenants do not spend more than 30% of their income for rent including a reasonable amount for utilities;

b.      Whether the CRHA has reviewed the sufficiency of the allowances and made appropriate adjustments, including maintaining records of annual utility allowance adjustments;

c.      Whether the CRHA failed to promulgate criteria and procedures for adjusting utility allowances for disabled, elderly or ill residents with special needs in compliance with the U.S. Housing Act;

d.       Whether the CRHA failed to notify public housing residents of the availability of such adjustments;

e.       Whether the CRHA failed to provide such other adjustments as required by governing law;

f.      Whether the CRHA breached Section 7.D of the Dwelling Lease by accelerating excess utility charges a full month prematurely for the period August 2003 through February 2011; and

g.      Whether the CRHA has failed to pay the amounts due to tenants under the incentive program adopted on July 28, 2003 to pay a $50 United States Savings Bond annually to each family that does not exceed its annual electrical allowance.

142.    The claims of the named Plaintiffs are typical of the claims of the class.

143.    The named Plaintiffs have the same interests as the other members of their class and will vigorously pursue these interests on behalf of the class.

144.    Plaintiffs will fairly and adequately represent the interests of the class. Plaintiffs know of no conflicts of interest among members of the class.

145.     Plaintiffs are represented by attorneys who are experienced litigators and who have handled numerous actions in the federal courts, including complex class actions, and who will adequately represent the interests of the entire class.

146.     A class action is appropriate under Rule 23(b)(2) and (b)(3) because the Defendants have acted on grounds generally applicable to the class by failing and refusing to provide adequate utility allowances, making injunctive and declaratory relief appropriate with respect to the class as a whole.  Questions of law and fact common to class members predominate over any questions affecting only individuals and to Plaintiffs' knowledge there is no current litigation of individual claims pending in any forum.  A class action therefore will allow the claims to be efficiently adjudicated in a single forum.

### FIRST CLAIM FOR RELIEF: VIOLATION OF THE U.S. HOUSING ACT

147.     CRHA has failed to update its electric utility allowance since 2003.

148.     CRHA charged an average of 73% of residents for excess electric utilities each month, and has charged as many as 92% of residents for excess electric utilities in a single month over the past two calendar years.

149.     Under HUD policies, the extremely high proportion of residents charged is prima facie evidence of the inadequacy of CRHA's current excess electric utility billing scheme.

150.     Adequate electric utility allowances are a condition precedent to the CRHA charging residents excess utility charges.

151.   The CRHA's failure to provide adequate electric utility allowances has required residents to pay in excess of 30% of their income for shelter costs and to incur inappropriate late fees.

152.   These actions have deprived Plaintiffs and the class of the benefits of CRHA's public housing program.

153.   Such acts violate the United States Housing Act, as amended, 42 U.S.C. §1437a (a)(3)(B)(1), and the federal regulations at 24 C.F.R. § 965.

154.   As a result of Defendants' violations of the U.S. Housing Act in charging tenants more rent than is allowed under federal law, Plaintiffs and the class they represent have suffered harm and are entitled to declaratory, injunctive  and monetary relief.

## SECOND CLAIM FOR RELIEF: VIOLATION OF RESIDENTIAL LEASE

155.    The CRHA's failure to provide adequate electric utility allowances and to manage the provision of electric utilities as stated in the residential lease violates the federal lease rights of Plaintiffs and the class.

156.    Defendants' failure to conform the language and practices of enforcing its lease provisions regarding adequate utility allowances for class members to the requirements of the Housing Act and regulations of the U.S. Department of Housing and Urban Development violates the lease provisions.

157.    The Defendants further violated the lease by accelerating alleged excess electric utility fees prior to the proper time allowable under the standard lease.

158.    Because Defendants inappropriately billed tenants without first notifying them in writing of the electric charges as required by the lease, tenants were deprived of an opportunity to question or challenge the fees before they became due.

159.    This accelerated billing also caused tenants to incur inappropriate late fees and, in some instances, court costs and eviction.

160.    Defendants' violations of the lease provisions have harmed Plaintiffs and the class members by causing them routinely to pay in excess of 30% of their income for rent.

## THIRD CLAIM FOR RELIEF: VIOLATION OF THE ANNUAL CONTRIBUTIONS CONTRACT (ACC)

161.    Plaintiffs are the intended third party beneficiaries of the CRHA's contractual agreements in the Annual Contributions Contract with HUD to abide by the requirements of the Housing Act of 1937 and implementing regulations.

162.    The ACC requires the CRHA to comply with HUD guidelines and regulations for the operation of public housing, including the setting of adequate utility allowances.

163.    The CRHA has failed to set adequate electric utility allowances as required by the ACC.

164.    The CRHA also failed to comply with HUD regulations requiring the implementation of a hardship plan to waive or reduce charges for families with disabled individuals requiring accommodations for increased electricity use due to their disabilities.

165.    As a direct and proximate result of Defendants' breach of the contractual provisions of the ACC with HUD, Plaintiffs have paid more rent than required by law, and some Plaintiffs and class members will be required to pay additional excess rent in the future.

## FOURTH CLAIM FOR RELIEF: VIOLATION OF CRHA POLICY RESOLUTION No. 2058, Revised Public Housing Utility Allowance, July 28, 2003  and VIOLATION OF VA. CODE § 8.01-27

166.    The Board's action in POLICY RESOLUTION No. 2058 established a contract with the residents with the Board's promise of a $50 US Savings Bond being offered in exchange for the tenant's willingness and effort to conserve electricity consumption to the standard set forth by the Resolution.

167.    The Defendant has failed to keep or deliver the promise of a $50 US Saving Bond to Plaintiff TelambriaTinsley and other class members, who went a full year without exceeding the electric utility allowance for the their housing unit.

168.     The CRHA has made no efforts to identify, recognize or compensate those who fulfilled the criterion set to be a conservation user.

169.     Plaintiffs may maintain an action under Virginia Code § 8.01-27 "upon any note or writing by which there is a promise, undertaking, or obligation to pay money, if the same be signed by the party who is to be charged thereby, or his agent."

170.     CRHA Policy Resolution No. 2058 is a writing promising to pay money in the amount of a $50 savings bond to any tenant household not exceeding the utility allowance in a 12 month period and was signed by a representative of the CRHA Board.

171.     Plaintiffs in the sub-class represented by Plaintiff TelambriaTinsley who did not exceed the utility allowance in some 12 month period after the passage of Resolution No. 2058 may therefore maintain an action against the CRHA for payment of the $50 bond.


## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court will:

1.     Assume jurisdiction of this case;

2.     Certify the plaintiff class and subclass pursuant to F.R.C.P. 23(a), (b)(1), (b)(2 and (b)(3);

3.     Issue a declaratory judgment that

A.     Defendants' failure to provide adequate electric utility allowances violates the United States Housing Act of 1937, the lease provisions which Plaintiffs and the class were required to sign, and the Annual Contributions Contract which the CRHA enters into with HUD;

B.     Defendants' failure annually to award the $50 bonds to tenants whose use of electricity remained below the allowance level violated CRHA Policy Resolution No. 2058 and Code of Virginia §8.01-27;

4.     Enter preliminary and permanent injunctions enjoining Defendants from failing to

comply with the U.S. Housing Act, the residential lease, and the Annual Contributions Contract by:

      A.    Constructing new utility allowances and keeping such allowances up to date sufficient to ensure that tenants' rent, including reasonable electric utilities, do not exceed 30% of income;

      B.    Promulgating and implementing procedures to adjust electric utility allowances when a tenant demonstrates that a higher allowance is needed because a member of the household is disabled, elderly or ill or that the higher usage is due to factors beyond the tenant's control;

      C.    Repairing tenants' check meters in a timely manner;

      D.    Including in the lease notice of the tenants' electric utility allowances;

      E.    Including in the lease notice of the available administrative procedure to contest utility surcharges; and

      F.    Ceasing to evict tenants for failing to pay excess electric utility charges prior to the annual updating of the allowances;

5.    Enjoining the Defendants to reimburse Plaintiffs and class members and provide equitable restitution for all excess utility changes imposed and collected  that were not  charged in accordance with federal law;

6.    Enjoining the Defendants to provide $50 saving bonds to eligible tenants and inform all tenants how to make a claim for payment of the bond(s);

7.    Award the Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. §1988; and

8.    Grant the Plaintiffs such other relief as may be just and equitable.

Respectfully submitted this 7th day of June, 2012.


/s/ *John Conover*
John Conover
Virginia State Bar Number 17872
LEGAL AID JUSTICE CENTER
1000 Preston Avenue, Suite A
Charlottesville, Va.  22903
PHONE 434-977-0553 x 103
FAX 434-977-0558
john@justice4all.org


_____
Abigail Turner
Virginia Bar Number 74437
LEGAL AID JUSTICE CENTER
1000 Preston Avenue, Suite A
Charlottesville, Va.  22903
PHONE 434-977-0553, x 138
FAX 434-977-0558
Abigail@justice4all.org


_____
Alex Gulotta
Virginia Bar Number 37097
LEGAL AID JUSTICE CENTER
1000 Preston Avenue, Suite A
Charlottesville, Va.  22903
PHONE 434-977-0553 x 102
FAX 434-977-0558
alex@justice4all.org


_____
Brenda Castañeda
Virginia Bar Number 72809
LEGAL AID JUSTICE CENTER
1000 Preston Avenue, Suite A
Charlottesville, Va.  22903
PHONE 434-977-0553 x 149
FAX 434-977-0558
brenda@justice4all.org                          10.0 - 6/7/12